IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
Plaintiff,

vs.

JEFFERY A. SHOCK,
Defendant.

Case No. 07-10227-01-JTM

MEMORANDUM AND ORDER

Defendant Jeffery Shock is charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of an unregistered firearm, in violation of 26 U.S.C. § 5841. The matter is before the court on the government's Motion in Limine (Dkt. No. 28), which seeks to exclude any evidence by the defendant regarding a claim of insanity at the time of the alleged offense.

Following the government's motion, the court conducted an evidentiary hearing, in which both the government and the defendant presented evidence as to the circumstances of the alleged offense – in which Shock was found in possession of a shotgun which had been stolen from a used car dealership in Wichita and then sawed-off – and Shock's mental condition and history.

The government introduced the testimony of Dr. Jermiah Dwyer, a forensic psychologist with the United States Bureau of Prisons. Dr. Dwyer had eight interview sessions with Shock after his arrest, and gave him an MMPI-2 psychological test and a Wechsler Abbreviated Scale of

Intelligence IQ test. He testified that Shock's IQ was normal. Dr. Dwyer reported that the MMPI-2 results were useless, however, since the profile showed "an extreme over exaggeration of symptoms." (Tr. I. 10). In particular, Dr. Dwyer noted the scores on the MMPI-2 tests given to Shock showed scores far in excess of what might be expected for persons hospitalized for mental illness (*Id.* at 29), and that in the 25-item Miller Forensic Assessment of Symptoms Test given by Dr. Moeller, Shock had endorsed 13 separate items. The test's cutoff score for malingering or exaggeration of symptoms is only 6.

Dwyer also reviewed the police reports and spoke with the arresting and transporting officers to find out about Shock's behavior on the day of his arrest. He testified that there was no indicia that Shock had any mental difficulties at that time. He found that Shock's behavior and statements at the time of his arrest were in fact inconsistent with "any form of psychosis." (*Id.* at 15).

Specifically, Dr. Dwyer testified that a person suffering from a psychotic fear of the police and seeking to acquire a firearm would go to a pawn shop or firearm dealership, rather than breaking into a used car dealership, in the hopes of serendipitously finding a firearm. After breaking into the dealership, Shock apparently "spent a considerable amount of time searching for various things" and came across the shotgun (which was behind a door in a backroom) by happenstance. (*Id.* at 16). He ultimately stole a Dodge Durango pickup truck from the dealership, but also took the shotgun and other items – petty cash, some tools, a fan, and an air compressor – with him. He later gave a rational and coherent explanation for his possession of the truck to his girlfriend. When a police officer subsequently observed Shock in the stolen truck and asked him to exit the vehicle, Shock did so peaceably and made no attempt to use the stolen shotgun.

In his testimony, Dwyer summarized the findings in his report –

> I put down a diagnosis of psychotic disorder not otherwise specified. I put a rule out for Post Traumatic Stress Disorder, given some of the traumatic experiences that Mr. Shock had reported to me, in addition to some of the ongoing examples of anxiety that had been reported prior, plus he was recording while he was in sessions with me.
>
> I put down dysthymic disorder, which is a chronic depressed mood disorder that is milder to some degree than a major depressive disorder but it is more consistent and chronic.
>
> I diagnosed him with polysubstance dependence, given the breadth and depth of his substance abuse history, particularly the number and quantities of different substances he's used when he's not been incarcerated.
>
> I also diagnosed him with Antisocial Personality Disorder with borderline features, given the conduct history that he's had with respect to his legal difficulties and some of the difficulties he's had in regulating his emotions, handling short-term stressors, interpersonal relationship, things like that.

(*Id.* at 18).

Dr. Dwyer noted the existence of Shock's earlier treatment in state custody, including notations concerning paranoia, but also found that there were no consistent explanations for any particular or persistent paranoid belief. Further, there was an absence of any psychotic symptoms (*Id.* at 21). When Shock left state custody in March of 2007, he was not on any antipsychotic medication. Dr. Dwyer concluded that there was "no evidence in any of the objective observations of Mr. Shock at the time of the offense, as well as the behavior pattern prior to and leading up to and during the offense" that Shock was suffering from any mental disease or defect. (*Id.* at 24). While Shock has subsequently described being in a dream-like state at the time, Dr. Dwyer found that such a condition was contradicted by Shock's lucid behavior at the time of the incident, his ability to provide biographical information to the transporting officer, and by his statements of what he remembered during the incidents. (*Id.* at 25-26).

The defense presented the testimony of Dr. Theodore Moeller, who reviewed the various reports in the case and conducted one three-hour examination of Shock. Dr. Moeller concluded that Shock suffered from a severe mental disease or defect, as reflected in his

> diagnosis of psychotic disorder NOS with a continuing option to rule out paranoid schizophrenia; an anxiety disorder not otherwise stated, with a provision to continue ruling out a full diagnosis of Post Traumatic Stress Disorder; and a diagnosis of dissociative disorder not otherwise stated, with the provision of ruling out further, more specific dissociative issues, such as dissociative amnesia, dissociative fugue or dissociative identity disorder.

(Tr. II. 8). Dr. Moeller's diagnosis of "psychotic disorder not otherwise specified" is premised on Shock's test results and his history of treatment for mental conditions. (*Id.* at 9). Dr. Moeller agreed that given the test results alone he might "have very easily come to a conclusion of malingering." (Id. at 12). However, Dr. Moeller believes that this is "very likely" a "false positive" given Shock's extensive history of mental difficulties. (*Id*. at 14). He further rests this conclusion on statements by Shock and his girlfriend indicating blackouts or memory lapses by Shock. (Id. at 15-16). Dr. Moeller described schizophrenia paranoid type as "a possibility" but not "a specific diagnosis." (*Id.* at 16).

Dr. Moeller criticized Dr. Dwyer's reliance on the police and other medical reports in the case showing an absence of any indicia of mental illness at the time of the offense, because

> he is making a supposition that you can't make, and that is that the record is an accurate reflection of reality. That the record accurately and completely reflects what happened at that particular time, on that particular ward or unit, as recorded by that particular practitioner, who may or may not have the same qualifications as Doctor Dwyer.
>
> If all of the people who made notes in those records had Doctor Dwyer's qualifications and experience, I would feel a whole lot more comfortable. Some of them were made by licensed practical nurses, some were made by mental health technicians, all of whom have a very important part to play. We don't know how

> accurately they saw those things. We don't know their level of training or their level of experience.
>
> I think Doctor Dwyer may have fallen into a trap that's very easy to fall into, which is to accept the medical record as prima facia evidence that this is evidence of what actually happened, when that's not the case.

(*Id*. at 21). Dr. Moeller testified that "[i]t's not appropriate, nor is it fair, to view the fact that his behavior was not remarkable as an indication that he was not suffering from some serious mental defect." (*Id*. at 22). He concluded that Shock's medical history was "consistent with his having a serious and persistent mental condition." (*Id.* at 23).

Asked on cross-examination what specific circumstances from the time of the charged offense were supportive of the existence of a mental disease or defect, Dr. Moeller replied, "[a]bsolutely none." (Id. at 33). Instead, his testimony was based on the previous indications of mental problems:

> This gentleman has had significant emotional problems before. He's got them now. It's a continuum. I simply cannot believe that they would have been in abeyance during that time period.

(*Id*. at 34).

Following the passage of the Insanity Defense Reform Act of 1984, the use of the insanity defense has been substantially limited. Under 18 U.S.C. § 17(a),

> [i]t is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

The government relies on *United States v. Ortiz*, 804 F.2d 1161, 1165-66 (10th Cir. 1986), where the court held that "the defendant is entitled to present the defense to the jury only if he can identify evidence from which a reasonable juror could derive a reasonable doubt as to the origin of

criminal intent ....” The defense at issue in *Ortiz* was an entrapment defense, but the government argues that the defense is analogous to an insanity defense, and the threshold test for the introduction of evidence is therefore the same. (Dkt. No. 49, at 2).

The defendant by contrast relies on the Fifth Circuit’s decision in *United States v. Dixon*, 185 F.3d 393 (5th Cir. 1999). In *Dixon*, the court concluded that an insanity instruction was appropriate where “‘evidence would permit the jury to find to a high probability that defendant was insane.’” *Id*. at 407 (*quoting United States v. Owens*, 854 F.2d 432 (11th Cir.1988). Following *Owens*, the *Dixon* court stressed that in deciding whether to submit an insanity defense to a jury, the “district court must construe the evidence most favorably to the defendant and that the ‘clear and convincing’ standard does not call for the highest levels of proof.” *Id*. at 404.

The government seeks to distinguish *Dixon* on the ground that in that case the defendant exhibited clear indications of mental illness during the criminal activity for which he was charged. While that may be true as a factual matter, the existence of indicia of mental problems contemporaneous with the crime itself is not a prominent feature of the court’s analysis in *Dixon*. Rather, the core of the defense in that case was the defendant’s “detailed evidence showing that he had a long history of mental illness.” *Id.* Such evidence of prior illness by itself would not be enough to justify an insanity defense, the court cautioned, but it could be if coupled with expert testimony explaining the impact of such illness on his conduct. *Id*. at 406-07.

The Tenth Circuit has followed a similar standard. “To use insanity as a defense to federal prosecution, the defendant must show by clear and convincing evidence that he suffered from a ‘severe mental disease or defect’ that rendered him ‘unable to appreciate the nature and quality or the wrongfulness of his acts.’” *United States v. Fisher*, 278 Fed.Appx. 810, 813 (10th Cir. 2008)

(quoting 18 U.S.C. § 17(a)). In *United States v. Holsey*, 995 F.2d 960, 963 (10th Cir. 1993), the court observed that

> counsel concedes that if a defendant files a timely notice pursuant to Fed.R.Crim.P. 12.2, he is entitled to an instruction on insanity only if there is some evidence of insanity. We agree. *See United States v. Prazak*, 623 F.2d 152, 154 (10th Cir.), *cert. denied*, 449 U.S. 880, 101 S.Ct.229, 66L.Ed.2d 104 (1980) (A trial court need not instruct on a defendant's theory of defense where there is no support therefor in the evidence.). So, whether Holsey was entitled to an instruction on insanity depends on whether there was evidence tending to show insanity sufficient to require an instruction to the jury on the matter.

In *Holsey*, the court held that an insanity instruction was not required where the defendant denied being insane, but testified that he felt "goofy in the head" and had "blacked out" during the robbery, and his sister testified that he had frequent memory problems. *Id*.

Indeed, the Tenth Circuit has explicitly adopted the standard set forth by the Eleventh Circuit in *Owens:*

> We hold that, where the issue of insanity has otherwise been properly raised, a federal criminal defendant is due a jury instruction on insanity when the evidence would allow a reasonable jury to find that insanity has been shown with convincing clarity. *Recalling the jury's right to determine credibility, to weigh the evidence, and to draw justifiable inferences of fact, the trial judge must construe the evidence most favorably to the defendant. The court also needs to remember that, although the "clear and convincing" standard is a fairly high one, "clear and convincing" does not call for the highest levels of proof. If evidence would permit the jury to find to a high probability that defendant was insane, an insanity instruction is required.*

*United States v. Denny-Shaffer*, 2 F.3d 999, 1015-16 (10th Cir. 1993) (quoting, and adding emphasis, to *Owens*, 854 F.2d at 435-36).

Applying this standard to the present case, the court finds that the government's *in limine* motion should be denied. The function of the court is not to weigh the evidence as to Shock's mental condition, and a rational fact-finder could conclude by clear and convincing evidence that Shock was unable to appreciate the nature and quality or the wrongfulness of his acts as a result of a severe

mental disease or defect. The government expresses concern (Dkt. No. 49, at 5) that a failure to enforce the limitations of 18 U.S.C. § 17(a) could "open the flood gates to the defense." However, this danger is substantially mitigated here by the existence of the extensive medical history of the defendant, including a prior (if temporary) diagnosis of psychosis.

IT IS ACCORDINGLY ORDERED this 16th day of January, 2009, that the government's Motion in Limine (Dkt. No. 28) is hereby denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE